Good morning, Your Honors. I'm Robert Cohen for GBL, the plaintiff in appellants in this case. I think substances that I make are a number of issues. I don't know if you want me to just give you a narrative of what I think the main issues are. Well, the most important thing to me, Mr. Cohen, is I look at that letter and it seems to me quite clear that the broker is responsible for the actions of its agent. They're legally responsible for the actions of the agent, so it seems to me that it's a claim against the broker. Now tell me why I'm wrong. Okay. Because whether or not it's a claim – whether or not that October 30th letter amounts to a claim against the broker, it seems by – well, the commonsensical question one would raise would be by looking at the letter. Does it say anything about the broker? No. No, but you're saying – I'm sorry. I'm sorry to interrupt you. I look at the letter.  I'm with you.  I look at the letter and it says, you know, we've got a claim against the agent here for his duties or errors or omissions as an agent. Correct. So doesn't that make the broker legally responsible? It does. It very well might, but that doesn't seem to me to be the relevant question. Counsel, why – It seems like it does mention the broker. For one thing, in the address, it sends it to Nick Siegel at the broker's address and it says DBI there. DBL, yes. DBL there. Yes. And then when it describes what Nick Siegel did wrong, it doesn't say when you were driving your family to your ski lodge, you had an intersection collision with my client. Right. It says that you basically defrauded my client when my client listed his house with you. Well, the client didn't list his house with Nick Siegel. He listed it with DBL. Right, but the letter didn't accuse DBL of doing anything wrong. It didn't say, hello, DBL, we're going to sue you. You better get a lawyer. You better run to your insurance company right now. Oh, the CC. Who is Mr. Fred Henry? Fred Henry is in what's called an office manager. I don't know what that means. DBL's office manager? DBL's office manager. Now, why – ordinarily, when you're trying to cause trouble for somebody, it's the CCs that you use to do it. That may well be true. I don't know that. I mean, yeah, that's a fair assumption. That might sometimes happen. But I can't read this any other way. This isn't just a private communication to Nick Siegel. It's a communication to the office manager at DBL. Two responses. Number one, we don't – look, either the letter was – what's relevant is, was it a question – excuse me. Was it a claim against DBL? Whether or not DBL had knowledge of the letter, whether or not DBL was CC on the letter. I can't read it any other way. I mean, it may be that the individuals at DBL were not only breaching their fiduciary obligation to the Messmans, but also their fiduciary obligation to DBL. But as between the Messmans and DBL, sure it is. Why? I mean, look. Because the Messmans hired DBL to sell their house. Right. And the people at DBL ripped them off. Correct. So why can't they be – look, you have a bad employee. We think you should be aware of this. Also, another important point. Well, if you do have a bad employee and you should be aware of it, you owe us the money. And it's your problem to go after people. They didn't ask him for the money. They said Nick Siegel, Mr. Agent, you owe us the money. It wouldn't be hard to say, hello, by the way, DBL, you owe us money, too. You better report this to your insurance company. I don't see where it says who should pay the money. They just want the money. It says demand is hereby made that you deliver to us a cashier's check in the amount of $320,000. It doesn't say whether the check should be drawn on Nick Siegel's account or DBL's. But whose account is not the question. Who is it in demand against? It uses the word you. And another point along the same lines, different legally but on the same fact, I cite in those all kinds of case laws long established that you can only – you cannot use hindsight in determining these coverage issues. At the time it made the denial, Executive Risk did not have any idea who Fred Henry was. In fact, there's nothing in the record except – Did DBL have any idea who Fred Henry was? Yeah, but that's not the question. The question is – Okay, let me suggest that what they had in front of them was a letter from DBL's counsel, Manning, Marder, Cass, dated March 13th. Right. It says to Executive Risk, I was recently notified concerning a claim being made against Dalton, Brown, and Long and their agents. They're telling them it's being made against Dalton, Brown, and Long. And that's just to believe the lawyer, the letter from the lawyer? We can believe the lawyer, but the answer to that question is, and only a little bit of this is in the record, but that letter you're referring to was written in March of 2001, 10 days before the filing. By that time, the Messmans had new lawyers who had been in discussions with DBL. But it attached the other letter. It didn't attach the relevant letter, the October 30th letter. It's 10 days before filing, right? And DBL's lawyer – 10 days before filing. By the Messmans. Okay. Okay? Three months after the October 30th letter, or more, about four months, okay? By that time, the Messmans' new lawyers, not Jeffrey Unger who wrote the October 30th letter, had been in contact with DBL's lawyer in the underlying case, Manning and Martyr. And they're saying, how are you going to accept service? What are we going to do about this? Hello, I'm the new lawyer. Get ready for this lawsuit. At that point, 10 days before the underlying lawsuit was filed, DBL's lawyer says, ooh, DBL's is being sued. Let's tender this. That's exactly what happened. So the implication that DBL or DBL's lawyer was admitting that the October 30th letter was a claim against DBL is, well, it's the wrong implication. It's factually wrong. It's also – I mean, I think I made that clear. I don't think I ever got an answer. Maybe I just missed it. But I go back to the original letter. Right. And the reality that DBL was legally responsible for Nick Siegel at the time of the original letter. Right. So that seems to me to end the question. Okay. I was trying to answer that. That's – that's as may be. DBL may very well be legally responsible for the sins and crimes of its agent, Nick Siegel. It's not may be. It's there's no possibility that it is not. Is there? But whether they are, in fact, responsible is not the question. The question is, is there a claim against them? Well, wait. The claim is stated for which, under the traditional principles of vicarious liability of an employer for the acts of his employees or principal or agent, they are unquestionably responsible. A claim is stated based on the employee's tort. The tort is described in such a way as plainly to be within the course and scope of Nick Siegel's activities as a salesman for DBL. Right. And the letter is addressed to Nick Siegel at DBL. Right. And it is cross-copied to DBL's office manager. I just don't get it. I just don't get how it can be anything but what Judge Kogue says, a claim directed at DBL. Okay. Well, again, the insurance policy does not say, hello, Mr. Insured, we will cover you whenever there is some claim coextensive with vicarious liability. It uses a different standard. It uses different words. It says we'll cover you when you're sued. This is not quite the right question. The problem is DBL is making a demand on an insurance company that didn't insure them October 30, 2000. The claim has to be made during the period of the policy. Correct. And the policy doesn't apply to claims that were made prior to the period of the policy. Correct. And so the only issue is whether, I thought the whole Montrose chemical thing was kind of a blind alley here for that reason. It strikes me as a policy period issue. Okay. And the question is, is this a claim made within the period of, is this a claim that wasn't made against DBL until subsequent communications? And I just don't get how the October 30 letter can be anything but a claim against DBL. Well, the claim against DBL was, what I'm saying, is when the lawsuit was brought against DBL, when there was any communication to DBL that DBL would be subject of a suit. That was in March of 2001. The October 2000 letter, three months earlier, was in a different policy period. And I agree with you. Wait. The letter says, it says we will avail ourselves of all remedies. It doesn't say we're not going to go after DBL, but we are going to sue Nick Siegel. It didn't say we're going to sue Rob Cohen, either. It just didn't raise the issue. How is it a claim? It said, hello, Mr. Nick Siegel, we're going to sue you because you did something bad to us. It didn't say we're going to sue DBL, too, and it's not that hard to say. But a claim is a demand against Nick Siegel. Right. For conduct for which DBL is legally responsible. That's the definition you quote in the reply brief. That's correct. So it's therefore a claim. It didn't, it was not a claim. It didn't say we're going to be a claim. It has to be against. So it's a magic words analysis. It's a magic words analysis. I don't think it's that at all. It's a, it's, I think it's easier than that. A claim is a demand for money. They did not make a demand for money, a demand for money against an insured. They did not make a demand for money against DBL. I might have, if I wanted to. If they make a demand for money against someone for whom DBL is legally responsible. True. Isn't that the definition of a claim? No. A definition of a claim is. A claim is a demand by any person or entity seeking to hold the insured responsible for monetary damage. That's respectful. That's mixing up what the subject is. It is a demand against an insured for when that insured is alleged to have done certain things. That insured here, DBL, was not the subject of any demand. But on the insured issue, isn't your problem that even though some of his behavior was outside the scope of his duties, some was also. Right. Okay. So he, wasn't he an insured since some of it was. Different, no. The short answer, it's a different argument. The answer to that is the policy language says that in order for Nick Siegel to qualify as an insured, he had to be operating solely, and that's the policy language, within the confines or in the capacity as. I think the word is only, not solely. As both. Because if you're an insured, if you're an employee and they have one set of language, and then you're also an insured as a, as an agent in a different set of language, one of them uses solely, the other uses only. The point here, and it's no dispute on the record, Nick Siegel was surely employed by DBL at the time he did these bad things, but there's no evidence anywhere that ripping off the Messamans and making his own LLC was part of his duties for DBL. I mean, it just doesn't make sense. It doesn't say he was part of his duties for the employer in the insurance agreement. The insurance contract just says with respect solely to the conduct of the named insured's business. Right. And it just says acting in the capacity of, and then it has these various capacities. Right. Exactly. So I don't get why it wasn't with respect to the Messamans claim, with respect solely to the conduct of DBL's business. Because the Messamans didn't, they hired DBL to sell their house. Yes, true. And the only reason Nick Siegel had any dealings at all with the Messamans or the house was that he worked for DBL. Presumably true. I mean, I don't know that. He may have found that independently, but presumably that's true. That's what the record indicates without contradiction, right? True enough. It doesn't, yes. Okay. But so, I mean. So how do you avoid the definition of insured being applicable? Okay. I hope I'm not just repeating myself, but the definition of insured is an agent or an employee only while acting in the capacity or for the business of the named insured. Show me the words you're relying on in the insurance contract. I'm having trouble. Okay. Because you're talking as though it's words in the contract, but I think it's interpretive laws put on the words by you. Sure enough. So show me the words. I'll use the exact language, okay? It's quoted here and there. I'm looking at the insurance contract in the excerpts at page 74. I have it on page 4. I have a quotation. Well, I like to look at the original rather than relying on an attorney's quotation. Excerpts page 74. Page 74. I think I'm looking at the right thing, and tell me if I'm not. Page 74, not exhibit. Excerpts of record, page 74. Yeah, okay. Yes. And the relevant. And you educate me if I'm looking at the wrong page. No, that's the right page. That's exactly right. The relevant paragraphs are 3 and 4, right, to this case. And they're saying who is an insured, right? And number 3 says, well, an insured is any past, present, or future natural person, partner, member, officer, director, or stockholder of the named insured, that's DBL here, or of the subsidiary, but, and here's what I'm focusing on, only while acting within the scope of that person's duties or capacities as such. What I'm saying is that here, with respect to the October 30th letter, not to the lawsuit, because that's an important difference, because that's what we're the question is, was he an insured with respect to the October 30th letter. And what I'm saying is that Nick Siegel was not, was not an insured here because he was not, the October 30th letter did not accuse him of things that were, while he was only within the scope of his duties or capacities as an employee. It accused him of setting up his own LLC, making his own secret profit, none of which had anything to do with his duties for DBL. In fact, the record is clear that DBL didn't even know anything about it, let alone authorize it. That's not what they hired Nick Siegel to do. And then it's a similar analysis applies to the next possible way such as he might be an insured, namely number four, which, well, applies to employees while acting on behalf of the named insured. Again, here's the key part, with respect solely to the conduct of the named insured's or a subsidiary's business. And what I'm saying is that what Nick Siegel is accused of having done was not with respect solely to the conduct of DBL's business. In fact, setting up a DBL, excuse me, an LLC had nothing whatsoever to do with the conduct of DBL's business. Therefore, he was not an insured with respect to the October 30th letter. I see. Thank you. Thank you. Counsel? Please, Court. Gilbert Jensen representing Executive Risk Insurance. I think the case ends with the October 30, 2000 letter. There's a claim both addressed to DBL and a claim addressed to Nick Siegel, who's an officer, a director, an employee of DBL. When that letter was sent, I think it's clear on its face what it's alleging. It says the Messmans are going to seek damages for fraud in paragraph one. This is the record at page 62. It also states in paragraph two, you were my client's agent. Your role was not disclosed in the purchasing side of that sale. It goes on to detail what the damages or what the alleged fraud was, what the broker failed to disclose to the Messmans. Among other things, they got the Messmans to reduce the sales price from $1,495,000, which was the initial listing price with DBL, to a sale for $1,175,000. Didn't disclose the fact that DBL's agent, the person who was selling the Messman house, was going to be involved in the purchase of the house and was going to turn it, turn it for a profit. The demand that is contained at page 63 of the record is for $320,000. As pointed out by the Court, it's a demand that Nick Siegel deliver us, the Messmans' attorney, a cashier's check in the amount of $320,000. It's a secret profit made as a result of the breach of fiduciary duty. Where is the fiduciary duty in this case? It's the duty owed by a seller's broker to the seller. It is that fiduciary duty that was breached. This would have been a claim under our policy language if it had been submitted, if it had been made first in our policy. Why wouldn't it have been excluded from coverage by the exceptions that Mr. Cohen is relying on? It could well have been excluded from coverage, but that doesn't answer the question of whether it is a claim. And at the time of the letter itself, the October 30th letter, there is nothing in this letter that would have given grounds to executive risk indemnity to deny this as a claim. If this had been presented to the insurer, so if the policy had been effective for the prior year and had been presented to you, you would have had a duty to defend. From this letter, yes. There is no evidence in this letter to allow executive risk to say, it looks like you took an interest in the sale that's greater than 10 percent. That doesn't appear in this letter, which is one of the exclusions we've also cited in our declination letter as a further reserved item. It also doesn't say that this is a – it's obviously not a claim that was made prior to the inception date of the policy, because we're assuming for this purpose that it was made within the policy. Do I have this right that what this really is is a policy period issue? Yes, it is. A claim, whether it was within the coverage of the policy or not, you're saying the policy period is the policy period covering October 32,000, because that's when the claim is made. Correct. If this claim had been presented in the policy in effect at that time, it would have been a claim. And if that had been so, whether there's one or another exclusion, such as maybe there's your own fraud exclusion, maybe there's an intentional acts exclusion, maybe the definition of insured allows for an exclusion. Who knows? Who cares? Perhaps the policy period. That's the policy period. Have I got that right? That's correct. It just seems odd to me that the DBL didn't tender it to whatever insurer was – insurance was in effect at the time the claim was – at the time the letter was sent. Why they didn't send that off to the then – you weren't – Executive Risk wasn't then insuring DBL, was it? Executive Risk was the insurer for the prior policy period also. But they didn't tender you the claim, and it's for claims made. It's claims made and reported. That's correct. And they didn't report it to you at that time. That strikes me as odd why they waited. It strikes me as odd also, Your Honor, plus with the idea, as the record shows, that the fact of the letter, it came in to the office manager of the CC. It came in to Mr. Siegel, who was an officer and director and one of the three owners of DBL. He discussed it with Mr. Long, the majority shareholder of DBL, but no notice was given to the insurance company. Maybe they didn't want any publicity about this. There might be a publicity issue pertaining to the ethics problem involved. There might also be an issue of how it might impact future premiums or insurability. Because it does involve such – what is a key issue to insurance agents and brokers about being as forthright as possible and the fact that DBL was involved in this transaction as the seller's agent, as the buyer's agent, and three DBL people being involved as the secret buyer. But there's no reason for us to not to question the presentation of the record here, that they just assumed it was going to go away for a while. It appears that they did assume that it would go away, or they hoped they could resolve it. At some point in time, it became apparent that they couldn't resolve it. I guess there are a lot of claims people do that with minor physical damage to their car with no personal injury. They figure they can just pay the body shop and avoid raising their rates. Raising their rates. They figure they could just pay off the messmen by saying, okay, we'll forfeit our commission. You can have your $60,000 or whatever it is. And between – in this case, between the two shareholders of DBL, Mr. Siegel tells Mr. Long, I'll take care of it. Mr. Long lets it go at that. And that took place in the first week of November of 2000. One other thing that – Just follow this scenario for a minute. How does it work, then, that you would – had it been presented in the prior period, you would have defended and at the point at which it became clear to you that these activities were outside the scope of employment, at that point you would have asserted your rights under the exclusions of the policy? That's correct. What probably would have been issued, because the letter does refer to a secret profit, and that raises the issue of certain exclusions within the policy, including unlawful profit or advantage. Certain items would have been reserved and the investigation would have gone on. Kumis counsel would have been appointed, because there is a conflict between the insurer and the insured in this circumstance. And the defense would have gone on at some point in time if evidence was obtained that we currently have. There probably would have been a withdrawal from the defense. Definitely for Mr. Siegel. And based on the exclusions, in my opinion, it probably would have been for DBL also. One other thing I'd like to point out about the policy in – I'm looking at a different part of the record where the same policy appears, at page 253, but it's the same policy referred to in Mr. Cohen's argument where the definition of insured is contained. The October 30, 2000 letter is a claim against DBL. And the first definition of insured at section D1 is the named insured. The named insured on this policy is DBL. There is no qualifying language in the definition of insured as it applies to the organization. Then if you move down to section D4, on the, again, definition of insured, it includes Mr. Siegel as the employee of the named insured while acting on behalf of the named insured. Certainly as the agent of DBL. It was Mr. Siegel that was out with the Messmans doing all the negotiating, helping them achieve a fair price on their property for the sale. With respect solely to the conduct of the named insured, DBL's business. Again, the conduct of the business is selling the Messman house. The concept of the conduct of the business includes the fiduciary relationship that the broker owes to its client, the seller. And it is that fiduciary relationship that resulted in a damage claim against DBL and against Mr. Siegel. The issue, I believe, in this case is was this a claim first made during the applicable policy period? And the answer, I believe, based on the October 30th letter is no. This was a claim first made before the inception, and because of that, it doesn't fit the insuring clause of the policy. Thank you, counsel. Thank you. Did we have any time left? Yes. Thank you. No. Counsel. I think the only issue that I unless there's a question, but I thought something that needed a little clarification was when one of Your Honors commented that it was odd that the claim was not submitted in October and it was waited until the lawsuit was filed in March of the following year. Well, I think the short answer to that, why it's not that odd, is because even though there was coverage, this is a renewal policy that we're talking about. There was coverage in the previous year at the time of the October 30th letter. And again, it partly repeats what I was saying earlier, but put yourself in DBL's position. That's easy. You wouldn't want your insurance agent to know that you're a bunch of crooks. That's one guess. If you can get out of it for $60,000. Fine. But look, another equally easy guess, you know, we can ascribe motives without looking at the record. But what is on the record is that DBL sees that one of its agents, Nick Siegel, is being accused of doing some bad stuff. What else is on the record? And this declaration was about this. The only thing on the record is that DBL says, well, Nick, why don't you go deal with that problem? It looks like you're going to be sued. And Nick says, okay, I'm going to deal with it. I'm going to fix this problem because it's my problem. It's not your problem. Well, they know perfectly well that it's not just Nick's problem. It's the whole bunch of them at the top of DBL. There's not. Nick had this little conspiracy with other individuals at DBL. That's true. But he didn't have a conspiracy with DBL, and DBL was not accused of anything. If DBL is going to read the key leads to look what is a lawsuit in my future, it seems like one fair thing we might do is look at the actual letter. And the letter doesn't say DBL, we're going to sue you. It doesn't say anything about DBL. It mentions DBL in the address line. That's all it says. It says Nick Siegel at Sunset Boulevard, DBL. That's not accusing DBL of anything. Okay? But if that's true, doesn't DBL then notify its insurer in order to protect its rights? In this case, it didn't, but it didn't have to. It wasn't being accused of anything. There wasn't a claim against it. There was a claim against Nick Siegel. It wasn't DBL's problem. As soon as it became DBL's problem, they had no compunction whatsoever about notifying the insurer. As soon as they found out that, uh-oh, we're a part of this, too, they didn't try to hide it like was suggested or implied earlier because they didn't want their premiums to run. I don't think that's my burden. What do you think your burden is? Well, maybe I misspoke. I mean, there's a – the background law is that DBL is not legally responsible     I don't think that's DBL's burden. The background law about Montrose Chemical, et cetera, is that if there is any question of fact, the tie goes – if there's any doubt whatsoever, any factual doubt whatsoever about the question of coverage under the duty to defend cases, that doubt is resolved in favor of the insurer. That's what I meant by saying I don't think that's my burden. Now, I'm not sure if that evades your question. Well, I stated the flip side of it, that it was your obligation to show us that there was some possibility that DBL would not be legally responsible at that point. Okay. Again, respectfully, I don't think that's the question. The question isn't might I be legally responsible, because I might be legally responsible for all sorts of things that do not arise. The question is, is there a claim against me? And all you have to go on, and what's fair to entitle them to go on, is looking at the letter. And the letter does not say we're going to sue you, DBL. It says we're going to sue your – your – No, it doesn't. It says unless a check for $320,000 is delivered to us, we're going to – By you. It names the delivery boy. No. But it doesn't say who the check has to be from, and it says unless we get the money, we're going to pursue all remedies. I understood that to mean the lawyer is going to figure out what remedies there are and go for all of them. And he hasn't bothered to do the work yet of figuring it out, because why should he if he gets all the money without having to spend a half day in the office figuring it out? Well, I mean, I don't – I don't mean to be flippant, but it used the word you. You has a meeting. It didn't say you and your employer. It said you. So you quoted the language earlier, unless you deliver us a check for $320,000. That's right. It names Nick as the delivery boy. That's not a delivery boy. It's asking for money. It's a claim. It's a claim against Nick. It's not saying, Nick, deliver us the money. It's saying, Nick, give us the money. It's a cashier's check. It doesn't say whose check it is. They don't know or care. Oh, that's okay. But I mean, who cares? As long as they get the $320,000. As long as – fine. That's not the question. The question – the relevant question is, is the letter a claim against DBL? And it's not. It's a claim against Nick Siegel. Okay. I guess I get it. All right. Thank you, counsel. Thank you. Dalton Brown v. Executive Risk is submitted. We are adjourned until 930 tomorrow.
judges: Kleinfeld, Wardlaw, Pogue